Filed 6/30/22  In re A.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.G. et al., Persons Coming Under the Juvenile Court Law. | |
| MADERA COUNTY DEPARTMENT OF SOCIAL SERVICES/CHILD WELFARE SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JESSICA C., <br><br> Defendant and Appellant. | F083289 <br><br> (Super. Ct. Nos. MJP017998, MJP018004) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Thomas L. Bender, Judge.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Regina A. Garza, County Counsel, and Ann Hanson, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Jessica C. (mother) is the mother of children A.G. and M.W. (collectively, the children), who are subjects of a dependency case. Mother challenges the juvenile court's orders issued at a contested selection and implementation hearing that resulted in mother's parental rights being terminated. Mother contends the juvenile court erred by failing to apply the beneficial parent-child relationship exception and considering inappropriate factors during its determination on the exception. We reject this contention.

Mother also argues that the juvenile court failed to comply with the duty to inquire and send notice under the Indian Child Welfare Act (ICWA). The Madera County Department of Social Services, Child Welfare Services (department) concedes that a conditional reversal is required for an unresolved inquiry of the children's possible Native American heritage. We agree with the parties and conditionally reverse the juvenile court's orders terminating parental rights and remand for proceedings to ensure ICWA compliance.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prior Dependency Proceedings

The present case marks the third round of dependency proceedings for 10-year-old A.G. and six-year-old M.W. In February 2013, mother participated in a voluntary family maintenance case with Fresno County Department of Social Services due to mother's physical abuse of the children's three older siblings, D.C. (now 18 years old), J.C. (now 17 years old), and S.G. (now 15 years old), (collectively, the siblings). The voluntary family maintenance case closed in February 2014, after mother met her case plan goals.

In June 2015, dependency proceedings were initiated in Fresno County Superior Court as a result of mother's physical abuse of J.C. and the risk that the children, D.C., and S.G. would be physically abused by mother. Mother and Michael W., the presumed father of M.W., both participated in family reunification services and were granted custody of their children with dismissal of dependency in February 2017.

2.

In August 2017, the children and siblings were initially detained by Madera County Department of Social Services, Child Welfare Services due to mother's discipline of D.C., J.C., S.G., and A.G. with a belt while intoxicated from alcohol. The department filed original petitions alleging the children and siblings were described by Welfare and Institutions Code section 300, subdivisions (a) and (b)(1).[1] The petition regarding D.C., J.C., S.G., and A.G. alleged that they were at risk of serious physical harm due to mother's alcohol abuse and use of a belt to discipline while intoxicated. The petition for M.W. further alleged that mother tested positive for methamphetamine and mother's struggle with addiction placed M.W. at risk of harm. Mother and Michael both denied having any Indian heritage during the juvenile court's initial inquiry.

The juvenile court sustained the allegations of the original petition with amendments and found that the children and siblings fell within section 300, subdivision (b) at a contested jurisdiction hearing in September 2017. In October 2017, Michael informed the juvenile court that M.W.'s paternal great-great grandmother was "full blood Choctaw" and her paternal great-grandmother was "Choctaw Blackfoot." Michael did not claim that he was a member of either tribe, and reported he had no idea of the lineage until he was notified by his cousin. Mother then explained how she recently discovered that the children's maternal great-great grandmother was Apache.[2]

Mother's Parental Notification of Indian Status form (ICWA-020) for A.G. indicated that she may have ancestry through the "New Mexico Apache Chiricahua" tribe. Michael's first ICWA-020 form for M.W. indicated his claimed ancestry of "Choctaw[ and] Blackfoot" and mother's claimed ancestry of Apache Chiricahua. The

---

**[1]** All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**[2]** The minute order records mother's reporting of Apache ancestry through the child's maternal great-grandmother.

juvenile court ordered the department to follow up with the information provided by the parents and send notice to the tribes.

Michael's second ICWA-020 form, filed six days later, detailed his possible membership in the Choctaw and "Blackfoot" tribes, M.W.'s potential membership in the Choctaw tribe, and the membership of M.W.'s lineal ancestor in the Choctaw tribe. At a later date, Michael reported that he had an enrollment number with the Blackfeet tribe, which resulted in a continuance of the disposition hearing.

On November 2, 2017, the department sent formal notice, pursuant to ICWA, to the eight bands of the Apache tribe regarding A.G. and the siblings. The ICWA notice detailed mother's claim of Apache ancestry through her family. A separate ICWA notice was sent on the same date to the eight bands of the Apache tribe, three bands of the Choctaw tribe, and Blackfeet tribe regarding M.W. The ICWA notice included mother's claimed Apache ancestry along with Michael's claim of Choctaw and Blackfeet ancestry. The notice included a Choctaw registry number of "525" for the child's paternal great-great grandmother.

At the disposition hearing held in January 2018, the children and siblings were returned home and mother and Michael were ordered family maintenance services. An addendum submitted by the department indicated that all tribes except Jicarilla Apache, Tonto Apache, White Mountain Apache, and Blackfeet responded within 60 days that the children and siblings were neither members nor eligible for membership in their tribe. The juvenile court found that the department gave proper notice pursuant to ICWA, and it found that ICWA was not applicable.

The report prepared for the section 364 review hearing detailed mother's completion of parenting, anger management, and substance abuse courses with consistent negative drug test results. On July 10, 2018, the juvenile court terminated its jurisdiction over the children and siblings with mother having sole legal and physical custody of A.G. and the siblings.

*Current Dependency Proceedings*

**Initial Removal**

On August 16, 2019, the department responded to the police station after A.G., at seven years of age, and her siblings J.C. and S.G., at 14 and 12 years of age respectively, went to the police station to report abuse by mother. J.C. claimed her mother bit her and banged her head on the floor. S.G. indicated mother " 'whoops' " the children with a belt, hanger, or cord, and mother and Michael were always arguing. Law enforcement believed mother had trouble with alcohol, and an officer regularly responded to the home due to multiple runaway reports regarding J.C. Mother also appeared to be intoxicated when she engaged in a physical altercation with J.C.

Shortly after midnight on the following day, the investigating social worker and a police officer informed mother that J.C., S.G., and A.G. were taken into protective custody. In her interview with the investigating social worker and law enforcement, mother denied regular use of alcohol and blamed J.C., who was on probation, for problems in the home. Michael stated, "things have gotten worse since the last CPS case," and it was a " 'hassle' " to get the children to listen to him and mother. Mother claimed the children did not respect her because of her prior dependency case and their knowledge that she is unable to " 'whoop' " them.

Based on the information obtained during the investigation, law enforcement placed five-year-old M.W. and her 15-year-old brother D.C. into protective custody. D.C. admitted to fighting often with J.C., but he denied that there were drugs or alcohol in the home. A.G. explained how her mother gets drunk, "drinks alcohol every single night," and fights with J.C. and Michael. A.G. only got in trouble when her mother drank alcohol, and she was disciplined by getting whooped with a belt or hanger, put in a corner, or grounded. M.W. reported her mother and Michael fight, but they did not hit each other.

The department filed an original petition alleging the children and siblings were described by section 300, subdivisions (a) and (b)(1). The petition alleged that the children were at substantial risk of suffering serious physical harm as a result of mother's alcohol abuse and discipline with a belt or hanger. Mother and Michael each completed ICWA-020 forms indicating that they were or may have been members of federally recognized Indian tribes. Mother claimed possible membership in the Apache tribe while Michael claimed possible membership in the "Blackfoot" tribe.

The report prepared for the detention hearing explained how ICWA "may apply" due to mother's claim of Apache heritage and Michael's claim of Blackfeet heritage. The notice from the previous dependency proceeding was described as being sent to the Apache, Choctaw, Blackfeet, Cherokee, and Navajo tribes. However, the notice itself did not include the Cherokee and Navajo tribes, and there was no indication that mother and Michael claimed such ancestry in the prior proceedings.

At the detention hearing held August 22, 2019, mother and Michael were both present and represented by counsel. Mother reported that her family claims to be "part Apache" in response to the juvenile court's initial inquiry. Michael responded to the juvenile court's inquiry regarding Indian ancestry by stating, "Yes, Blackfoot and Choctaw, and -- Choctaw registry No. BM525 for my great grandmother. [¶] . . . [¶] . . . And we have no information on the Choctaw [sic] ancestry." Michael reported that he would try to find paperwork documenting the enrollment number.

The juvenile court found that ICWA may apply based on the statements of mother and Michael, and it informed county counsel of the need to research the issue. Furthermore, the juvenile court wanted to compare the information from the prior case to determine whether additional notices were necessary after mother's counsel informed the juvenile court that ICWA was previously found inapplicable while verification was pending for Jicarilla Apache, Tonto Apache, and Blackfeet.

6.

After the parties submitted on the detention report, the juvenile court ordered the children and siblings detained from the home of mother and Michael, reasonable supervised visitation between the mother, Michael, and their children as determined by the department, and the setting of a jurisdiction hearing for September 19, 2019.

**Jurisdiction and Disposition**

After multiple continuances, a combined jurisdiction and disposition hearing was scheduled for February 24, 2020. The disposition report filed February 20, 2020, recommended that the children remain in out-of-home care with family reunification services provided to mother and Michael. It was also recommended that the juvenile court find ICWA not applicable based upon the findings related to ICWA notice in the prior proceedings for both Apache and Blackfeet heritage.

The social study detailed mother's criminal history of two prior convictions for driving under the influence, and she was arrested for driving under the influence in November 2019. Mother began using methamphetamine at 14 years of age, but she claimed that she stopped using methamphetamine five years earlier. The children and siblings were in her car when she was arrested for driving under the influence (DUI), and she was not attending weekly alcoholism recovery meetings due to her work schedule. She also reported that Michael was "100% Blackfoot."

Mother was attending her supervised visitations twice per week, which were said to be going well. Her recommended case plan included objectives of remaining sober and refraining from physical punishment on her children. The responsibilities of her case plan included a parenting program, any recommended substance abuse and mental health treatment, and random drug and alcohol testing.

On the date of the combined jurisdiction and disposition hearing, the department filed a first amended petition as part of a resolution between the parties, which provided more specific allegations regarding mother's alcohol abuse and inappropriate discipline, J.C.'s engagement in risky behaviors, and mother and J.C.'s physical altercations.

7.

Mother and Michael both submitted on the reports, and the juvenile court found the allegations in the amended petition true, ordered reunification services to both mother and Michael, and set a six-month review hearing for August 13, 2020. The juvenile court also found that ICWA was not applicable because mother and Michael did not claim any Indian heritage through filed ICWA-020 forms.

**Family Reunification Period**

The department prepared a report for the six-month review hearing, which recommended that family reunification services be continued for mother and Michael. The children were placed together in a resource family home while the siblings were either placed in separate homes or on runaway status. Mother had failed to complete her mental health assessment because she missed multiple appointments, and she once attempted to complete an assessment while under the influence. Mother completed her parenting program in November 2019. She was discharged from one substance abuse program for lack of attendance, and she failed to make any progress in her nine-month DUI program for her criminal matter. Mother admitted to continually drinking alcohol on a regular basis while refusing to participate in drug testing.

The supervised visitation schedule changed to weekly for two hours at a time. In October 2019, supervised visitation increased from a weekly two-hour visit to twice weekly for three hours total each week. The children enjoyed the food that mother made for their visit, but there were many concerns noted during visits. Visitation notes detailed inappropriate conversations, use of profanity, and a chaotic environment. Mother questioned the children about sexual abuse allegations during one visit. Multiple care providers reported that mother was loud, disrespectful, aggressive, and used profanity when supervised telephone visits replaced in-person visits as a result of the COVID-19 pandemic. The children expressed their desire to remain with their current care providers, who were willing to provide a permanent plan, because they did not feel safe in their mother's home.

The juvenile court continued the six-month review hearing and set the matter for a 12-month review hearing in October 2020 due to the rapidly approaching 12-month review period. In an addendum report for a 12-month review hearing, the department recommended that reunification services be terminated for mother and Michael with the setting of a section 366.26 hearing for the children based upon their failure to meet the objectives of their case plan and demonstrate the necessary behavior changes to provide a safe home for their children.

During a recent supervised visit, M.W. began crying inconsolably after mother discussed her boyfriend, and M.W. stated, " 'I don't think my mom loves us.' " Mother was arrested after a domestic violence dispute with her boyfriend, who was a sex offender and drug user. In a meeting with the department, mother reported she was participating in mental health services and DUI classes to reinstate her driver's license.

The juvenile court eventually held a contested 18-month review hearing on January 27, 2021, after multiple continuances. Family reunification services were terminated for mother and Michael, and a section 366.26 hearing was set for May 13, 2021. The juvenile court also found that there was information provided concerning the child's possible Indian ancestry, but the information was too speculative and did not provide it with a reason to believe or know the child is an Indian child. Therefore, the juvenile court again found ICWA was not applicable. Mother filed a notice of intent to file a writ petition and writ proceedings were initiated in our case No. F082337. However, mother did not file a writ petition and her case was dismissed as abandoned.

**Section 366.26 Hearing**

The department's section 366.26 report, filed May 5, 2021, recommended that the juvenile court terminate the parental rights of mother, Michael, and the biological father of A.G. and order a permanent plan of adoption for the children. The siblings remained in separate placements with different permanent plans recommended for each. The children remained placed with their only care providers since removal, who were willing

9.

to provide a permanent plan of adoption. No developmental or medical concerns were noted for the children.

A.G. (now nine years old) and M.W. (now six years old) were observed to be thriving in all areas during their time in the care provider's home. In March 2021, mother's visits were reduced to twice per month. During one of the video visits, A.G. complained about mother's repeated use of profanity, and she also wondered why mother was drunk during the visit. Visits were reduced to once per month in April 2021.

The department acknowledged mother's consistent visitation before noting her inability to address the issues that brought the children to the attention of the court. According to the department, the benefits of continuing the parent-child relationship were not found to outweigh the benefits of an adoptive home for each child. Based upon its determination that no exceptions to adoption were applicable, the department concluded that the most appropriate plan for the children was adoption.

Section 388 petitions were filed by mother's counsel on June 25, 2021, requesting additional family reunification services as to each of the children. The petition alleged mother "started an outpatient program, anger management classes, celebrate recovery, and drug testing. She also has signed up for parenting classes, and has gained employment." Mother's request for additional reunification services was alleged to serve the children's best interest because the children were, "young and would benefit from having a relationship with [their] mother."

The department recommended against granting mother's section 388 petitions, citing a lack of changed circumstances in an addendum report filed July 16, 2021. The report noted mother's attempt to commit suicide while she was intoxicated in February 2021. Although mother was currently in an outpatient program and going to classes, the department did not believe mother made significant changes to address the reasons the children came to the juvenile court's attention.

On July 22, 2021, mother's petitions were heard in combination with the contested section 366.26 hearing, which concluded on August 25, 2021. Mother's father-in-law testified that mother had not appeared under the influence in his presence during the last three to four months. Mother testified about her recent efforts in the programs described in her section 388 petitions. Mother began attending a faith-based support group called "Celebrate Recovery" two months prior, an outpatient drug treatment program one month prior, and individual therapy one day prior. Mother participated in anger management classes and worked fulltime as a caregiver for in-home supportive services.

Mother testified that she had not used alcohol or marijuana since May 26, 2021, but she continued to test positive for marijuana during her weekly drug testing through the outpatient program. After her suicide attempt, she wanted to change her life and feel differently about herself. Mother denied being under the influence during video calls with the children, but she acknowledged her habit of using profanity in the presence of the children. The director of mother's faith-based support group testified that mother was "very secure in her recovery." The director also acknowledged having limited information regarding mother's history of alcohol use, and she spoke to mother privately only a "few times."

The juvenile court denied mother's section 388 petitions, and it proceeded to allow argument from counsel on the section 366.26 phase of the hearing. Mother's counsel argued the beneficial parent-child relationship and substantial interference with a sibling relationship exception to termination of parental rights applied. (§ 366.26, subd. (c)(1)(B)(i), (v).) County counsel acknowledged that mother visited consistently, but she argued the evidence demonstrated that the children's relationship with mother was not beneficial.

After hearing argument from all counsel, the juvenile court proceeded to its ruling as follows:

"Well, regarding continuing relationship with Mom, there have been ongoing visits, but not all of them have been appropriate. Mom acknowledges that she's working on it, but, still, that's the case. I don't think there's evidence of the kind of bond between Mom and these two younger ones to the extent that it's in the best interest of these kids to keep that bond.

"I think the kids have been out of home for quite some time, and they need a permanent place, and the permanent place is being offered by their current care provider. So I don't think that -- that exception has been established by Mom."

The juvenile court followed the department's recommendation and terminated the parental rights of mother and the children's fathers and selected a plan of adoption. Mother filed a timely notice of appeal on September 10, 2021.

## DISCUSSION

### I. Beneficial Parent-Child Relationship Exception

Mother contends the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption. Mother argues the uncontested evidence established that the exception was applicable. She further asserts that the juvenile court erred by considering improper factors and failing to "engage in the subtle and case-specific analysis" in determining that the exception did not apply.

#### A. *Legal Principles*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

12.

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

The second element of the exception asks whether the child would benefit from continuing the relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship – in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid.*) While an adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to

those problems, making the loss "not, at least on balance, detrimental." (*Ibid.*) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

In *Caden C.*, the Court of Appeal held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 625-626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id.* at p. 638.)

### B. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639-640.) The juvenile court's decision as to the third element – whether termination of parental rights would be detrimental to the child – is reviewed for an abuse of discretion. (*Id.* at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights, is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, at p. 1528.)

### C. Analysis

In the present case, the juvenile court determined that mother did not meet her burden of proof as to the application of the beneficial parent-child relationship exception. The parties acknowledge the juvenile court's finding that mother visited regularly. However, the juvenile court did not find that there was sufficient evidence of a substantial, positive relationship or that any such relationship outweighed the benefits of adoption to establish the exception.

Mother initially contends that the uncontested evidence established that the exception was applicable in this matter. In support of this contention mother cites to evidence that "visitation apparently went well the majority of the time" because there were only a few instances of negative interactions described by the department's reports. Mother then attempts to characterize those negative interactions in a positive light, and she claims the department failed to provide all relevant evidence of mother's interactions with the children.

Based on the present record, we cannot find that the evidence compels a finding of the parent-child exception as a matter of law. Mother's suggestion that sufficient reporting by the department would have described the details of "many positive visits" between mother and the children ignores the fact that it was her burden to prove the exception. Even if we were to accept that mother often enjoyed pleasant visits with her

15.

children, such evidence is not enough to preserve parental rights. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant."])

Mother's insistence that the relationship she maintained with the children was of such significance that the children would be greatly harmed by its severance was not supported by the record. There was simply no evidence that the children were suffering any type of emotional harm as a result of the limited interaction with their mother over the last two years. The children were well-adjusted after lacking stability and permanency during several years as dependent children.

In sum, this is not a case in which "the undisputed facts established the existence of a beneficial parental . . . relationship." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) For these reasons, we conclude that the juvenile court acted well within its discretion in deciding that this was not one of the extraordinary cases where the preservation of parental rights outweighed the preference for adoption. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

Next, mother cites to the recent cases of *In re B.D.* (2021) 66 Cal.App.5th 1218 and *In re J.D.* (2021) 70 Cal.App.5th 833, in support of her contention that the juvenile court's orders must be reversed for improper consideration of certain factors.

In *In re B.D.*, *supra*, 66 Cal.App.5th 1218, a juvenile court noted that "the social worker's report stated that the paternal grandmother met the children's daily needs and opined that the parents were 'currently not in a position where they are able to take on the parental role.' " (*Id*. at p. 1229.) The juvenile court also emphasized the parents' failure to complete the reunification plan and their continued untreated substance abuse issues. (*Id*. at pp. 1229-1230.) The *In re B.D.* court found the juvenile court's reliance on the fact that the parents had not completed their reunification plan and were unable to meet the children's needs to be "concerning because it is unclear what weight the juvenile

court placed on these conclusions when balancing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis." (*Id.* at p. 1230.) The appellate court reversed, without conducting a harmless error analysis, so the juvenile court could conduct a new parent-child bond exception analysis in light of *Caden C.* (*Id*. at p. 1231.)

Similarly, in *In re J.D.*, the appellate court concluded that it was unclear to what extent the juvenile court—there, acting before *Caden C.*—considered improper factors at the second step of analyzing the parent-child beneficial relationship exception, and it reversed and remanded for a new section 366.26 hearing in accordance with *Caden C.* (*In re J.D.*, *supra*, 70 Cal.App.5th at pp. 865, 870.) Specifically, it observed that the juvenile court had appeared to improperly consider "the mere fact [that the mother] had been unable to succeed in overcoming her parenting struggles" (*id*. at p. 864), "the suitability of [the minor's] current placement" (*ibid*.), the minor's attachment to his current caregiver, and the court's determination that the mother did not occupy a " 'parental' " role—all factors improper under *Caden C.* (*In re J.D*., at pp. 864-865).

The cases cited by mother are distinguishable because the juvenile court in this case did not refuse to apply the beneficial parent-child relationship exception based solely on the mother's failure to make "sufficient progress in addressing the problems that led to dependency." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) A parent's "continued struggles" with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception. (*Ibid*.) However, a parent's struggles with the issues that led to the dependency are "relevant to the application of the [parental-benefit] exception" because it may be probative of whether interaction between parent and child has a negative effect on the child. (*Ibid*.) "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child" (*ibid*.), while "[c]onversely, a parent who gains greater understanding of herself and her children's

17.

needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" . . . effect' on them" (*id.* at pp. 637-638).

In considering the parent-child relationship exception here, the juvenile court rejected mother's argument at trial by discussing negative interactions during visits, mother's lack of a significant bond with the children, and the children's need for stability. It then reasoned that the evidence did not establish that maintaining the children's bond with mother outweighed their need for permanency.

We do not find that, in making its determination, the juvenile court abused its discretion by relying on impermissible factors. The department's report does contain statements that mother failed to make progress on the issues leading to removal, and it includes descriptions of the suitability of the children's foster placement. However, the juvenile court's ruling on the exception did not consider mother's inability to provide a home in comparison to the suitability of their current placement, and there is no indication that the juvenile court relied on mother's "continued struggles" to bar the parent-child relationship exception. Viewed in its context, the juvenile court considered the proper factors of the children's need for permanency and stability, the effect of interactions with mother, and the nature of the parent-child relationship. On balance, it concluded that continuing the children's relationship with mother was not as beneficial as their need for stability.

Finally, mother argues that the juvenile court erred by failing to engage in a case-specific analysis to determine whether a " 'substantial, positive emotional attachment' " existed between the children and mother that would benefit the children by continuing the relationship. However, the juvenile court was not required to recite specific findings relative to its conclusions regarding the elements of the exception when it declined to apply the exception. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Although a trial court's statement of its findings or an explanation of the reasons for its decision may be

helpful in conducting appellate review, it is not a legal requirement. (*Ibid.*) Thus, the juvenile court did not err in failing to further explain the basis for its decision.

Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating mother's parental rights were proper.

## II.     ICWA Inquiry and Notice

Mother also contends the duties of inquiry and notice were not diligently discharged such that reversal is necessary to ensure compliance with ICWA. Mother cites to inconsistent identification of tribes in social worker reports, lack of a report on inquiries of the parents' claims of ancestry, and lack of evidence that the parents denied having Indian ancestry. The department acknowledges that "some deficit may have existed" in relation to ICWA compliance, and it claims that there is an unresolved inquiry to a federally recognized tribe. However, the department argues that the matter need only be remanded for the limited purpose of ICWA compliance.

### A.     *Legal Principles*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene (25 U.S.C. § 1911(c)) and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; see § 224, subd. (e)). An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe and is the biological child of

a member of a federally recognized tribe.  (25 U.S.C. § 1903(4), (8); see § 224.1, subd. (a) [adopting federal definitions].)

In every dependency proceeding, the agency and the juvenile court have an "affirmative and continuing duty to inquire whether a child is or may be an Indian child . . . ."  (Cal. Rules of Court, rule 5.481(a); see § 224.2, subd. (a); *In re W.B.* (2012) 55 Cal.4th 30, 53; *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.)  "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ." (§ 224.2, subd. (b).)

"There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe.  Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)."  (§ 224.2, subd. (e)(1).)

"When there is reason to believe the child is an Indian child, further inquiry is necessary to help the court, social worker, or probation officer determine whether there is reason to know a child is an Indian child."  (§ 224.2, subd. (e)(2).)  Further inquiry includes, but is not limited to, interviewing the parents and extended family members to obtain the name, birth date and birthplace of the Indian child, the name of the Indian tribe in which the child is a member or may be eligible for membership, all names known of the Indian child's biological parents, grandparents, and great-grandparents, including maiden, married, and former names or aliases, as well as current and former addresses, birth dates, places of birth and death, tribal enrollment information of direct lineal

ancestors of the child and any other identifying information if known. (§§ 224.2, subd. (e)(2)(A), 224.3, subd. (a)(5)(A)-(C).)

### B. *Standard of Review*

A juvenile court's finding that the ICWA is inapplicable is reviewed under the substantial evidence standard. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) Thus, we must uphold the juvenile court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we must indulge all legitimate inferences in favor of affirmance. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)

### C. *Analysis*

In the present case, mother and Michael both claimed Indian ancestry at the detention hearing. Mother claimed possible ancestry through the Apache tribe while Michael indicated that the child's paternal great-great grandmother was a member of the Choctaw tribe. Michael initially provided an enrollment number that was either for himself or the great-great grandmother.

The juvenile court acknowledged that ICWA may apply based on this information, and it requested that the department compare the information provided from the ICWA notice for the prior dependency proceedings. However, at disposition, the department merely recommended that ICWA be found inapplicable based upon the fact that proper ICWA notice was provided in the prior dependency proceedings in 2017. The juvenile court found that ICWA was not applicable after incorrectly finding that mother and Michael did not claim any Indian heritage through filed ICWA-020 forms.

There is no evidence in the record that either the department or the juvenile court followed up with further inquiry regarding the parents' claims of ancestry from the detention hearing. As a result of the failure to further inquire into the parents' repeated claims of ancestry to determine if new information had been uncovered since the prior proceedings, we cannot say that the juvenile court and department adequately discharged their duty of further inquiry. (See § 224.2, subd. (j).) Because nothing in the record

shows the department completed the minimum further inquiry required by section 224.2, we will accept the parties' concession and remand the matter for the limited purpose of compliance with the directives of ICWA and of section 224.2.

## DISPOSITION

The finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the agency to comply with the inquiry provisions set forth in section 224.2.

If, after the court finds adequate inquiry has been made consistent with the reasoning in this opinion, the court finds ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court finds ICWA does not apply, the finding that ICWA does not apply to the case shall be reinstated.

In all other respects, the court's orders terminating parental rights are affirmed.


SMITH, J.

WE CONCUR:


FRANSON, Acting P. J.


PEÑA, J.

22.